**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| ANTHONY REIN and JACQUELINE REIN, | ) ) | |
| | ) | Case No. 19-cv-8130 |
| Plaintiffs, | ) ) | |
| | ) | Judge Robert M. Dow, Jr. |
| v. | ) ) | |
| THERMATOOL CORPORATION, | ) ) | |
| Defendant. | ) | |

**MEMORANDUM OPINION AND ORDER**

In 2019, while working at his employer's Illinois-based factory, Plaintiff Anthony Rein's hand was crushed after he inserted it through an access hole in a metal-cutting machine. The metal-cutting machine, called the Flying Cutoff, was manufactured by Defendant Thermatool Corporation, which designed and sold the Flying Cutoff to Rein's employer in 1994. Following his injury, Rein and his wife, Jacqueline Rein, filed suit against Thermatool, asserting claims sounding in strict liability, negligence, and loss of consortium.[1]

Now before this Court is Thermatool's motion for summary judgment [48, 50]. Thermatool asserts that any opportunity to bring product liability and negligence claims related to the product at issue expired in 2005 under Illinois law, see 735 ILCS §§ 5/13-213, 214, and that any negligence claim that arose after that point fails because Thermatool did not voluntarily undertake a duty to warn Rein about the dangers of a hole created by someone else nearly two decades after the initial purchase.

---

[1] Throughout this opinion, all references to "Rein" are meant to indicate Plaintiff Anthony Rein, not Plaintiff Jacqueline Rein, unless otherwise indicated.

As explained in further detail below, this Court agrees that Thermatool is entitled to judgment as a matter of law because Plaintiffs' claims are barred by the ten-year statutes of repose. Rein suffered the injury in 2019, more than two decades after Thermatool customized the Flying Cutoff, an integral feature of Metal-Matic's Illinois facility. The Court concludes that Plaintiffs have not introduced a triable issue of fact on their claim that Thermatool owed Rein a duty. Metal-Matic, not Thermatool, created the hole in the Flying Cutoff into which Rein placed his hand. Plaintiff has introduced no triable issue that Thermatool voluntarily undertook a duty to warn Rein about the dangers of that hole and thus summary judgment is proper on the remaining negligence claim as well. In sum, the Court grants Thermatool's motion for summary judgment [48, 50] in full. A final judgment consistent with Federal Rule of Civil Procedure 58 will issue on the claims. Civil case terminated.

## I. Background

### A. Factual Background

This case is about the injury of Anthony Rein, an employee of Metal-Matic on a machine called the Thermatool Alpha Flying Ram Cutoff. Before elaborating on the incident, the Court will briefly describe the machine's purchase, provide an overview of Metal-Matic's operations, and set out the subsequent alterations to the machine that are pertinent to the resolution of this case.

#### 1. Overview: Metal-Matic and Purchase of the Flying Cutoff

Rein's employer, Metal-Matic, is headquartered in Minneapolis, MN, and has four facilities in total. [61 (Pls.' Resp. to Def.'s Statement of Material Facts ("Pls. SOF")) at 7, ¶¶ 4–6.][2] Although neither party states the kind of business Metal-Matic does, they refer to Metal-

---

[2] Plaintiffs include an "statement of additional material facts" beginning on page 7 of docket number 61. Plaintiffs restart the paragraph numeration, so there is more than one paragraph one, for example. To avoid

Matic's "manufacturing operation" and note that it employs "electricians, maintenance repairmen, welders, and machinists." [49 (Statement of Undisputed Material Facts in Support of Thermatool Corp.'s Mot. for Summary Judgment ("Def. SOF")) at ¶ 3; 61 at 7, ¶ 6.]

At the Bedford Park, Illinois facility where Rein worked, Metal-Matic owns a machine called the Thermatool Alpha Flying Ram Cutoff ("The Flying Cutoff"), "a large piece of business equipment" used "to assist Metal-Matic with the manufacturing operation at its Bedford Park Facility by cutting metal pipes with a diameter of up to four inches." [49 (Def. SOF) at ¶¶ 3, 6.] Although the Flying Cutoff is one of two such machines located at the Bedford Park plant, see [61 (Pls. SOF) at 7, ¶ 7],[3] a Metal-Matic company representative named Anthony Bolz testified that the company's various flying cutoff machines feature some differences, including the direction of the pipe entering the relevant cutoff, the size of the viewing window for the cutoff, different hinge mechanisms, and the different diameter of pipe that the subject machines could cut. [67 (Reply to Pls.' Statement of Additional Facts ("Def. Reply to Pls. SOF")) at ¶ 11; 62-3 (Ex. D, Dep. Tr. of Anthony Bolz ("Ex. D, Bolz Dep.")) at 4, 22:2 – 10, 22:18 – 23, 23:8 – 12; at 5, 29:1 – 20.][4]

Turning to the details of the purchase of the machine in question here, in 1994 Metal-Matic, Inc. ordered the "four-inch Thermatool Alpha Flying Ram Cutoff" from a manufacturer called Thermatool Corporation for its Bedford Park plant. [49 (Def. SOF) at ¶ 1; 48-2 (Avolio Decl., Ex.

---

confusion, the Court will specify which *page number* and **paragraph number** at which the information can be found as follows. For example [61 (Pls. SOF) at *8*, **¶ 10**.]

[3] Metal-Matic also owns at least six flying cutoff-machines at its Minneapolis plant. [61 (Pls. SOF at 8, ¶ 9.] A flying cutoff machines was also moved to Metal-Matic's Bedford Park facility in 1989, although given that it was moved five years prior to the purchase of the Flying Cutoff that is the subject of this suit, the only reasonable inference is that the machine that was moved is a different machine. [61 (Pls. SOF at 8, ¶ 10.]

[4] For clarity, all pin cites to deposition transcript refer to the pagination of the page on the docket (italicized here), then the page of the deposition transcript (bolded here) and the line of the deposition (underlined here). See, *e.g.*, [62-3 (Ex. D, Bolz Dep.) at *4*, **22**:2–10.]

1 Sales Work Order ("Ex. 1, Flying Cutoff Sales Work Order")).] According to the sales order

and proposal dated April 1994, the machine cost $462,000.00. [49 at ¶ 2; 48-2 at 15.]

The 1994 purchase required Thermatool's assistance in designing and overseeing the start-

up of the machine through 1995. Among other things, Metal-Matic ordered installation and layout

drawings. See [48-2 (Ex. 1, Flying Cutoff Sales Work Order) at 18] (listing installation/layout

dwg's due: 07/01/94; equipment dwg's/manual due: 07/01/94). Pursuant to the sales order,

Thermatool provided a twenty-eight-page series of "detailed drawings, including floor plans * * *

relating to the Flying Cutoff." See [48-1 (Decl. of Robert P. Avolio in Support of Mot. for

Summary Judgment ("Avolio Decl.")) at ¶ 3] (listing exhibit 2 as copies of the design drawings

for the flying cutoff that is the subject of this case); [48-3 (Avolio Decl., Ex. 2 ("Ex. 2, Design

Drawings")); 69 (Decl. of Michael A. Nallen ("Nallen Decl.")) at ¶¶ 3–4, 7.] Regarding training

and supervision, a customer acknowledgment form indicates that a Thermatool representative

visited the facility in 1995 and that the equipment had been installed and left in acceptable

condition. See [48-1] (listing Exhibit 4 as a copy of a Thermatool customer acknowledgment form

from June of 1995 in relation to the installation of the product at issue); [48-5 (Avolio Decl., Ex.

4 ("Ex. 4, Custom Acknowledgment Form")) at 2–3.] The form further indicates that the

Thermatool representative trained operators, set up blades, and made test cuts during the visit. [48-

5 at 3; 69 at ¶ 8] (acknowledging that the service form was for installation of the Flying Cutoff and

that Thermatool representatives "assisted with the commissioning of the Flying Cutoff, including

offering training").

## 2. Maintenance and Repairs of the Flying Cutoff

In the decades following the original purchase, Metal-Matic ordered maintenance and

repairs on the Flying Cutoff machine on several occasions. While Metal-Matic's own employees

performed some of this maintenance, Thermatool and a third-party vendor performed repairs or inspections in other instances.

Critical here, on May 10, 2012, Metal-Matic performed a "corrective maintenance" on the machine, meaning a priority, unplanned repair. [49 (Def. SOF) at ¶ 7 & n.3; 48-1 (Avolio Decl.); 48-9 (Avolio Decl., Ex. 8 ("Ex. 8, Phillips Dep.")) at 5, 74:3–8; at 7, 75:24–76:8; at 8, 84:12–17.] The work order for the repair, which calls for an employee to "cut an access hole for cut-off" and to "install a cover for it," [48-9 at 11, 90:14–91:3], is available as an exhibit to the motion for summary judgment, see [48-7 (Avolio Decl., Ex. 6 Equipment Work Order Entry)).] An employee in Metal-Matic's maintenance department named Albert Holmes was assigned to and did perform the maintenance. [49 at ¶¶ 7, 10; 48-1; 48-9; 48-4 (Avolio Decl., Ex. 3 ("Ex. 3, Fornnarino Dep.")) at 8, 108:11–16; 48-8 (Ex. 7, Dep. Tr. of Anthony Bolz ("Ex. 7, Bolz Dep.")) at 5, 102:9 – 13.] Holmes "cut an access hole for the cut off and install[ed] a cover for it as well." [49 at ¶¶ 7, 10.]

Metal-Matic's designated corporate representative testified that the access hole was created to facilitate an infrequent repair of the top rail of the Flying Cutoff. [49 (Def. SOF) at ¶ 35; 48-4 (Ex. 3, Fornnarino Dep.) at 4, 9:23–10:4; at 16, 124:6–22.] The cover to this hole was a flap secured by a hinge located at the top of the access hole. [49 at ¶ 8; 48-4 at 10, 118:24–120:20.] The flap was made of sheet metal roughly 1/16th to 1/8 of an inch thick. [48-4 at 11, 119:3–9.] To create the hole, Holmes would have used either a plasma cutter or grinding saw, which Metal-Matic possessed in May 2012. [49 at ¶ 7; 48-8 (Ex. 7, Bolz Dep.) at 6, 104:19–105:13] The access hole was large enough to allow a person to access the interior of the Flying Cutoff by hand. [49 at ¶ 11.] However, there were no interlocks that would have shut off the Flying Cutoff when the flag covering the access hole was lifted. [Id. at ¶ 9; 48-4 at 12, 120:8–12.]

As noted above, Thermatool also visited the Bedford Park facility to perform repairs to the Flying Cutoff. Some of those repair visits occurred after Metal-Matic cut the access hole described above. [49 (Def. SOF) at ¶ 26; 48-13 (Avolio Decl., Ex. 12 ("Ex. 12, 2016 & 2017 Maintenance Records")).] The visits addressed issues relating to the cutting length on the Flying Cutoff and issues with a tracking wheel. In April 2016, Thermatool's representatives conducted a service call to "check the speed, changes to the ram, and quoting a single valve manifold to replace the dual." [61 (Pls. SOF) at 8, ¶ 12a; 62-4 (Pls.' Ex. E ("Ex. E, Thermatool Customer Service Acknowledgment")) at 5.] Thermatool billed four hours for the repair at $150 per hour plus six hours of travel. [61 at 8, ¶ 12a.] In September 2016, Thermatool representatives visited again, this time to "resolve" a problem regarding "cut length varying on Alpha." [*Id.* at ¶ 12b; 62-4 at 11.] In October 2016, Thermatool representatives performed a service call "for the machine not holding length and to record the parameters." [*Id.* at ¶ 12c; 62-4 at 2–3.] In January 2017, Thermatool representatives returned again for "traking wheel, machine holding and length variation," billing 10 hours of on-site time. [61 at ¶ 12d; 62-4 at 7–10.]

In 2018, a third company came into the picture. Metal-Matic hired a company other than Thermatool to conduct a safety inspection of its equipment at the Bedford Park facility. According to Metal-Matic's employee, Ronald Phillips, the company completed an "OSHA walkthrough inspection and identified things that * * * should be corrected so we could be a safer plant." [66 (Reply Memo. of Law in Further Support of Def. Thermatool Corp.'s Mot. for Summary Judgment ("Def. Reply Br.")) at 6; 68-5 (Gaunce Decl., Ex. E ("Ex. E, Phillips Dep.")) at 4, 49:2–4.]

### 3. Rein's Accident

Anthony Rein had worked for Metal-Matic since 2014 and had been trained to assume a new position as the cutoff operator beginning in mid-to-late 2018. [49 (Def. SOF) at ¶¶12–14; 48-

11 (Avolio Decl., Ex. 10 ("Ex. 10, Rein Dep.")) at 4, 14:5–25; at 9, 40:3–9.] Rein assumed his new role as cutoff operator for the Flying Cutoff around the last week of January 2019. [49 at ¶ 15; 48-11 at 12, 87:14–88:11.] As the name implies, Rein's new role was to run the Flying Cutoff. [49 at ¶ 14; 48-11 at 8, 26:4–6.]

On February 13, 2019, during Rein's shift as cutoff operator for the Flying Cutoff, sprayer blades on the machine kept breaking. [49 (Def. SOF) at ¶¶ 17–18; 48-11 (Ex. 10, Rein Dep.) at 12, 87:1–4, 11–13.][5] To address the problem, Rein's co-worker handed him a plastic bottle of lubricant and asked him to spray lubricant on the blades. [49 at ¶ 19; 48-11 at 150:7–14.] Just as his colleague had, Rein reached his hand into the Flying Cutoff through the access hole that Metal-Matic employee Anthony Holmes had created in 2012. [49 at ¶¶ 20–21; 48-11 at 14, 150:1–14; 61 (Pls. SOF) at 10, ¶ 23; 62-6 (Pls. Ex. G, ("Ex. G, Rein Decl.")) at ¶¶ 10–11.]

Unfortunately, the machine was still running. When Rein lifted the flap and inserted his hand and the oil sprayer into the machine, the anvil on the Machine came down, crushing Rein's right hand. [48-11 (Ex. 10, Rein Dep.) at 18, 159:8–15; at 166:7–167:3; 62-6 (Ex. G, Rein Decl.) at ¶ 10.] Rein was hospitalized for twenty-one days after the incident and incurred numerous surgeries, lost almost all function in his right hand, and has not been able to return to work. [62-6 at ¶ 12.] This lawsuit followed.

## B.    Procedural Posture

In November 2019, the Reins filed suit in state court against Thermatool Corporation, the manufacturer of the Flying Cutoff. The three-count Complaint [1] alleges that Defendant Thermatool was strictly liable for the Flying Cutoff's design and manufacturing defects which

---

[5] Plaintiffs contend that the sprayer blades breaking was a frequent problem. Thermatool disagrees. Although this is a disputed issue of fact, the issue is not material, nor does it preclude summary judgment because any defects or dangers arising from the design of the sprayer blades are subject to the products liability and construction statute of repose. See Section III, below.

rendered the product defective, unsafe, and unreasonably dangerous. Rein further alleges that Thermatool was negligent for its failure to contain a guarding device and because it failed to provide adequate warnings. Finally, Jacqueline Rein brings a derivative loss of consortium claim against Thermatool. Thermatool removed the suit to federal court pursuant to diversity jurisdiction.

Thermatool then filed an answer and affirmative defenses. The answer stated that "Plaintiff's cause of action is barred by the applicable statute of repose, including, but not limited to, 735 ILCS 5/13-213." On April 7, 2021, Thermatool served a Rule 11 letter on Plaintiffs. [68 (Decl. of Nicholas M. Gaunce, Esq. ("Gaunce Decl.")) at ¶ 2.] The letter raises the Illinois construction statute of repose, 735 ILCS 5/13-214, cites cases in which Illinois courts have applied the statute to business machinery, and attaches the 1994 sales order for the Flying Cutoff. [*Id.* at ¶¶ 3–4.] Plaintiffs then filed an uncontested motion to extend fact discovery until August 31, 2021, which the Court granted [41.] Counsel for Plaintiffs also advised opposing counsel of their intent to file an amended complaint. [68 at ¶¶ 5–7.] However, Plaintiffs did not actually amend.

That brings us to the instant motion. Thermatool Corp. moved for summary judgment [48, 49] on August 26, 2021, seeking judgment as a matter of law on all three of Plaintiff's claims for strict liability, negligence, and loss of consortium. Plaintiffs do not contest summary judgment on Mr. Rein's strict liability claim [60 (Pls.' Resp. to Def.'s Mot. for Summary Judgment ("Pls. Br.")) at 8, 12.] Therefore, this Court will limit its analysis to whether Thermatool is entitled to judgment as a matter of law on the negligence and loss of consortium claims.

## II. Legal Standard

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P.

8

56(a). A genuine dispute as to any material fact exists if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248 (1986). "On a motion for summary judgment, the moving party has the burden of demonstrating that there are no genuine questions of material fact and that he is entitled to judgment as a matter of law." *Green v. Whiteco Indus., Inc.*, 17 F.3d 199, 201 (7th Cir. 1994). "Once a party has made a properly-supported motion for summary judgment, the opposing party may not simply rest upon the pleadings but must instead submit evidentiary materials that 'set forth specific facts showing that there is a genuine issue for trial.'" *Harney v. Speedway SuperAmerica, LLC*, 526 F.3d 1099, 1104 (7th Cir. 2008) (quoting Fed. R. Civ. P. 56(c)). As noted above, in evaluating a motion for summary judgment, the Court construes all facts in the light most favorable to the nonmoving party and draws all reasonable inferences in favor of the nonmoving party. *Bell v. Taylor*, 827 F.3d 699, 704 (7th Cir. 2016).

## III. Analysis

In support of summary judgment [48, 50], Thermatool primarily argues that Plaintiffs' negligence claim is barred by 735 ILCS 5/13-214, also known as the "construction statute of repose." That statute is designed in part to prevent engineers and architects from defending stale claims by barring claims arising from conduct more than ten years following, *inter alia*, a defendant's design construction activities. In opposition [60], Plaintiffs contend that the statute of repose does not apply on these facts, and that at the very least a genuine dispute of fact precludes judgment as a matter of law on statute-of-repose grounds. As a backstop, Plaintiffs argue that the statute of repose does not preclude all its theories of negligence.

The Court agrees with Thermatool that most of Plaintiffs' theories of the case are time-barred. However, to contextualize how the Court will organize the structure of this opinion and to

9

elaborate on Plaintiffs' backstop argument, it is helpful to lay out Plaintiff's theories of negligence. According to Plaintiffs, (1) Thermatool "owed Mr. Rein a duty to manufacture a safe product;" [60 (Pls. Br.) at 19], and (2) Thermatool "owed a duty to warn" Rein [60 at 21] about "the dangerous condition of the Machine," specifically "the dangers presented in the Machine as it existed at the time of the incident," [*id.* at 23.] Finally, Plaintiffs also assert that (3) because the 2012 modification (the access hole and flap) existed when Thermatool repaired the Flying Cutoff in 2016 and 2017, Thermatool had a duty to "as the manufacturer who maintained and repaired the machine." See [*id.* at 24.] Thus, the first two theories concern Thermatool's manufacture of the Flying Cutoff in 1994, whereas the third theory arises from Thermatool's repairs of the Flying Cutoff in 2016 and 2017, which occurred after Metal-Matic created the access hole. Relevant to the instant summary judgment motion, Plaintiffs assert that even if this Court finds that the statute of repose bars its first two theories about the original manufacturing, the third theory concerns independent, unrelated conduct—repairs and maintenance—that is not insulated by the statute. In reply [66], Thermatool retorts that even if the repair visits are not insulated by the statute of repose, Plaintiffs' negligence claim fails on the merits.

As explained in detail below, Thermatool has the better of the argument. In Part A, the Court addresses Plaintiffs' former two negligence theories, which arise from Thermatool's original construction and design activities, are time barred by the statute of repose. In Part B, the Court then assesses whether assuming for the sake of argument that Plaintiffs could pursue a negligence claim based on Thermatool's repairs to the Flying Cutoff in 2016 and 2017, that claim would fail on the merits in any event.

### A.     Negligence from Original Defects and Failure to Warn

The Court begins with Thermatool's primary argument, which is that 735 ILCS 5/13-214(b) applies to Plaintiffs' negligence claim.  Specifically, Thermatool asserts that the statute of repose bars any claim ten years after a manufacturer installs, or assists in installing, an improvement to real estate, so any opportunity to bring a negligence claim involving the product at issue expired in 2005.  In opposition, Plaintiffs first insist that the construction statute of repose is an affirmative defense that Thermatool waived by omitting it from its Answer and Affirmative Defenses.  Second, Plaintiffs contend that—in advancing this affirmative defense—Thermatool has not met its burden to show that 735 ILCS 5/13-214(b) applies to this case.

### 1.     Waiver

As a threshold matter, the Court must consider Plaintiffs' argument that Thermatool has waived the construction statute of repose by failing to raise it in its Answer and Affirmative Defenses.  Federal Rule of Civil Procedure 8(c) requires affirmative defenses to be raised in the pleadings.  However, the Seventh Circuit ha[s] held that a delay in asserting an affirmative defense waives the defense "only if the plaintiff was harmed as a result."  *Curtis v. Timberlake*, 436 F.3d 709, 711 (7th Cir. 2005).  See, *e.g.*, *Matthews v. Wisconsin Energy Corp.*, 642 F.3d 565, 570 (7th Cir. 2011) ("The failure to plead an affirmative defense in the answer works a forfeiture only if the plaintiff is harmed by the defendant's delay in asserting it." (quoting *Carter v. United States*, 333 F.3d 791, 796 (7th Cir. 2003)).  Absent such prejudice, a district court does not abuse its discretion in entertaining a belatedly-raised affirmative defense. See *id.*  The Seventh Circuit has further instructed that the rule that "forfeits an affirmative defense not pleaded in the answer (or by an earlier motion) is, we want to make clear, not to be applied rigidly."  *Matthews*, 642 F.3d at 570 (internal quotation marks omitted) (quoting *Herremans v. Carrera Designs, Inc.*, 157 F.3d

11

1118, 1123 (7th Cir.1998)).  Compare *Curtis*, 436 F.3d at 411 (in affirming district court's decision to reach an affirmative defense, the Seventh Circuit reasoned that no harm flowed from the omission of affirmative defense from the defendant's answer because the plaintiff was aware of the issue earlier and had an opportunity to address the affirmative defense on summary judgment), with *Herremans*, 157 F.3d at 1123 (refusing to excuse forfeiture when, without excuse "at no time during the 13 months that the case was pending in the district court did [the defendant] let out a peep about the statute of frauds, and as a result [the plaintiff] was deprived of an opportunity to conduct discovery that might have enabled him to rebut the defense.").

The construction statute of repose, 735 ILCS 5/13-214(b), is not waived in this case because Plaintiffs have not introduced evidence they have been harmed as a result.  To be sure, Thermatool omitted the specific statute from its Answer & Affirmative Defenses.  However, Plaintiffs were put on notice of the issue early in the case when Thermatool raised the construction statute of repose in its Rule 11 letter.  Plaintiffs then requested—and received—three additional months of fact discovery.  The additional time (1) gave Plaintiffs a sufficient opportunity to marshal facts about whether the statute was applicable to Thermatool; and (2) afforded Plaintiff sufficient time to consider, amend, and convey its intent to amend its Complaint based on the new issue (an avenue Plaintiffs ultimately opted not to take).  Three days before the cutoff for fact discovery, Thermatool filed the instant motion for summary judgment, which afforded Plaintiffs the opportunity to address the issue in the instant summary judgment briefing as well.  Rule 56(d) also was available for Plaintiffs to invoke if they believed additional discovery was needed to fairly respond to Thermatool's motion.  With all of these avenues open, the Court cannot say Plaintiffs were prejudiced by Thermatool's omission of the statute from its Answer & Affirmative Defenses.

### 2.     Construction Statute of Repose

Having found no waiver, the Court turns to the merits.   Thermatool asserts that the construction statute of repose, 735 ILCS 5/13-214(b), bars Plaintiffs' negligence claim.   Plaintiffs disagree, contending that the statute is inapplicable to the machine here because the Flying Cutoff (A) was not an improvement to real property, and (B) Thermatool did not engage in activities within the scope of the statute.   Section 5/13-214(b) provides in relevant part:

> No action based upon tort, contract or otherwise may be brought against any person for an act or omission of such person in the design, planning, supervision, observation or management of construction, or construction of an improvement to real property after 10 years have elapsed from the time of such act or omission.

735 ILCS 5/13–214(b).   The ten-year expiration date is designed "for the express purpose of insulating all participants in the construction process from the onerous task of defending against stale claims." *MBA Enters., Inc. v. Northern Ill. Gas Co.*, 717 N.E.2d 849, 851 (Ill. App. Ct. 1999). "Section 13–214(b) applies when: (1) the item at issue is an improvement to real property; and (2) the defendant's actions fall within the scope of the activities enumerated in the statute." *Id*.

Because it is an affirmative defense, the "party seeking summary judgment based on the statute of repose * * * bears the initial burden of identifying evidence tending to show that its [product] was installed * * * more than ten years before an" incident. See *Avery by Avery v. Mapco Gas Prods.*, 18 F.3d 448, 452 (7th Cir. 1994) (applying statute of repose under Indiana state law). Once a defendant shows that evidence exists to satisfy the requirements of the Construction Statute, "[the plaintiff] bear[s] * * * the burden of establishing an exception to the statute."   See *Crisman v. Peoria & Pekin Union Ry.*, 846 F. Supp. 716, 719 (C.D. Ill. 1994).

### a.     Improvement to Property

According to Plaintiff, the machine that injured him does not satisfy the first inquiry because the machine was not an improvement to property.   In *St. Louis v. Rockwell Graphic*

*Systems, Inc.*, 581 N.E.2d 93, 96 (Ill. 1991), the Illinois Supreme Court elaborated on the meaning

of "improvement to property."  As the Seventh Circuit summarized *St. Louis*'s teachings:

> In *St. Louis v. Rockwell Graphic Systems*, the Illinois Supreme Court attempted to define the term "improvement to real property," looking first to the Black's Law Dictionary definition of "improvement":
>
> "A valuable addition made to property (usually real estate) or an amelioration in its condition, amounting to more than mere repairs or replacement, costing labor or capital, and intended to enhance its value, beauty or utility or to adapt it for new or further purposes."
>
> The court then specified certain criteria for determining what constitutes an improvement to real property: (1) whether the addition was intended to be permanent or temporary; (2) whether it became an integral component of the over-all system; and (3) whether the value and use of the property was enhanced. *Id.* This circuit and the Illinois appellate courts have also noted that the application of § 13–214(b) should focus on the entire construction project and not merely on a single component of the system.

*Garrison v. Gould, Inc.*, 36 F.3d 588, 592 (7th Cir. 1994) (cleaned up).  Whether categorized as

three or four criteria, Illinois courts and the Seventh Circuit apply the *St. Louis* definition.

"Whether an item constitutes an 'improvement to real property' is a question of law. Its resolution,

however, is grounded in fact."  *St. Louis*, 605 N.E.2d at 556–57; *Garner v. Kinnear Mfg. Co.*, 37

F.3d 263, 266 (7th Cir. 1994).

    *Garner* is illustrative.  In that case, the plaintiff was injured by a mounting plate on a garage

door system.  The Seventh Circuit held that the mounting plate constituted an improvement to real

property, finding the criteria laid out in *St. Louis* satisfied: the plate "was a component of the

overheard door assembly that [defendant] installed * * * as part of a building addition;" the plate

and door assembly constituted "integral components of the building addition" because it facilitated

"ingress to and egress out of the building;" it was "new and was not merely a replacement or repair

of an existing door;" "there was no indication that the door was installed for temporary rather than

permanent use;" and it clearly "enhanced the value and utility of the original real estate, since the

assembly * * * allowed easy movement of large objects and materials into and out of this building" and "obviously added value to the building." *Garner*, 37 F.3d at 267–68; see, *e.g.*, *Gomez v. Arkema*, 2014 WL 983198, at *5–6 (N.D. Ill. Mar. 12, 2014) (concluding on summary judgment that a machine qualified as an improvement to property where "all four criteria point[ed] to the same result." The component "help[ed] to puff and harden malted milk ball center" which was clearly "a valuable and useful function for a property where malted milk balls are made." The component was specifically designed to produce milk balls and was "integrated into a larger system." Despite that the machine was capable of being transferred, "it would be unreasonable to conclude that a large, unmoved machine * * * essential to the operation of an entire system of production was intended to be temporary").

Here, the Flying Cut-Off is an improvement to real property because all four factors weigh in favor of that finding. The machine was meant to be a permanent addition to the facility and had been part of the facility since 1994. Photographs taken at the time of installation show it is a large, multi-part piece of business equipment that was not easily movable and an integral part of Metal-Matic's production operation. [49 (Def. SOF) at ¶ 6.] It is one of two cutoff machines that exist at the facility. [*Id.* at ¶ 3.] Although Thermatool has not enlightened this Court of what, exactly, it produces, the Flying Cutoff is the only machine that could cut pipes up to four inches in diameter, which is undoubtedly important to a manufacturing plant. [*Id.*] The machine increases the value of the Bedford Park facility, as it cost just south of half a million dollars at the time of purchase in 1994. [*Id.*] In sum, the Flying Cutoff is a permanent, integral part of the Bedford Park facility that increases the facility's value and enhances its ability to perform an integral business function. Accordingly, the Flying Cutoff constitutes an improvement to property, the first prong of the statute of repose.

In an effort to upend the proposition that the Flying Cutoff is an improvement to real property, Plaintiffs assert that the machine is a product that falls under the products liability statute of repose. [60 (Pls. Br.) at 15.] They further argue that Thermatool is a machine manufacturer, not an engineer, contractor, or builder. Plaintiffs also contend that the machine was not customized. In support, they note that it was produced with a serial model number and serial number, meaning the machines "were produced by [Thermatool] in a standardized manner and that the subject Machine was not specifically made for Metal-Matic." [*Id.* at 16.] They also add that there is no evidence of accommodations needed to the Bedford Park facility to install and operate the machine. [*Id.*] Furthermore, they point out that a similar machine was moved from the Minneapolis to the Bedford Park facility. [*Id.*]

Most of Plaintiffs' arguments miss the mark because they conflate the Court's first and second inquiries. Plaintiffs' claims that the Flying Cutoff was a glorified off-the-shelf product that was not customized are pertinent to whether Thermatool's conduct implicates construction activities, but do not shed light on the first inquiry—whether the machine amounted to an improvement to property. The Court will address those arguments below.

All that leaves[6] is Plaintiffs' insistence that the Flying Cutoff could potentially be moved, as another cutoff machine was in fact moved. Accepting as true that the machine *could* be

---

[6] Plaintiffs' attempt to draw on *Hayes v. Ortis Elevator*, 946 F.2d 1272 (7th Cir. 1991), fares no better because *Hayes*—a case about a different statute and which did not raise 735 ILCS 5/13-214(b)—has nothing to do with whether the Flying Cutoff constitutes an improvement to property. *Id.* at 1277. In *Hayes*, a defendant asserted that a negligence claim arising from plaintiff's injury on defendant's escalator was precluded by the Illinois products liability statute of repose. The appellate court affirmed the district court's grant of summary judgment that the products liability statute of repose applied. *Id.* at 1277–78. No party raised, nor did the Seventh Circuit reach, the construction statute of repose, much less whether the escalator constituted an "improvement to property." Furthermore, the Seventh Circuit has specifically held that the two statutes are not mutually exclusive, as "in Illinois a product can be considered an improvement to real property—the class of products and the class of improvements to real property are not mutually exclusive." *Witham v. Whiting Corp.*, 975 F.2d 1342, 1345 (7th Cir. 1992) ("Illinois cases hold that a particular good can be both a product subject to the strict liability doctrine and an improvement to real property. 'The short answer is that a product, under certain circumstances, can constitute an improvement to real property'").

moved—on occasion and with great effort—still no reasonable jury could find the machine was temporary given the sheer size of this heavy-duty machine and its integral function to the Bedford Park facility. See, *e.g.*, *Garner*, 37 F.3d at 266–67 (rejecting plaintiffs' contention that "the mounting plate is a 'product'" in part because "it was merely attached to a mounting apparatus with a few bolts. The case law, however, does not indicate that these factors are controlling in determining whether an item is an 'improvement' within the meaning of the statute") (footnotes omitted)); *Gomez*, 2014 WL 983198, *5–6 (rejecting Plaintiff's argument that a machine did not qualify as an improvement because fact issues lingered over whether machine was bolted down, even if machine was "essentially free-standing," and could be removed without causing harm to the facility, the machine was integral to factory operations and far from a "mere repair or replacement").

### b.  Construction Activities

Plaintiffs' second argument is that Thermatool cannot meet its burden to show that it engaged in construction activities. [60 (Pls. Br.) at 16.] As Plaintiffs note, to qualify for the protections of 735 ILCS 5/13-214(b), Thermatool must also show that it "participated in the 'design, planning, supervision, observation or management of construction, or construction" of the improvement.'" A "defendant falls within the protected class if it engaged in any one of the listed activities." *Herriott v. Allied Signal, Inc.*, 998 F.2d 487, 490 (7th Cir. 1993). "The concluding phrase, 'of construction,' modifies each of the enumerated activities, and not merely the final one." *Garrison*, 36 F.3d at 592–93. In evaluating the second prong, "'[m]ere labels are not dispositive' and section 13–214 'protects, on its face, anyone who engages in the enumerated activities.'" *Herriott*, 998 F.2d at 490–91 (alteration in original) (quoting *Hilliard*, 834 F.2d at 1358 n.6). "The statute protects anyone, regardless of status, if that party's engagement in an enumerated

17

construction-related activity is the sole basis of a particular claim." *MBA Enters.*, 717 N.E.2d at 851.

As an example from the statutory list, 5/13-214(b) reaches the activities of persons who are "engaged in the 'design of construction.'" *Garrison*, 36 F.3d at 592–93. To evaluate whether a manufacturer has "engaged in design of construction," "courts have focused on whether the manufacturer's product is custom-made or standardized." *Id.* "[A] manufacturer must perform some role related to the construction site beyond provision of standard products generally available to the public and not custom designed for the project." *Id.* at 593. See, *e.g.*, *Ill. Masonic Med. Ctr. v. AC&S*, 266 Ill. App. 3d 631, 638 (Ill App. Ct. 1994) (manufacturers must "demonstrate its role in the construction extended beyond furnishing standard products generally available to the public"). As the Seventh Circuit has explained, if courts did not require some degree of customization, "a manufacturer's exposure to liability for a defective product would rest solely on the fortuity of its incorporation in an 'improvement to real property.'" *Garrison*, 36 F.3d at 593.

A trio of cases inform the question of whether a manufacturer-defendant's conduct amounts to "design of construction." In both *Herriott v. Allied Signal, Inc.*, 998 F.2d 487 (7th Cir.1993), and *Hausman v. Monarch Mach. Tool Co.*, 997 F.2d 351 (7th Cir. 1993), the Seventh Circuit affirmed the district court's judgment in favor of a manufacturer who designed tailor-made equipment. In *Hausman*, this second prong was satisfied where defendant "was involved, at the very least, in the design, planning and supervision of the construction of" a large machine installed in the employer's plant. 997 F.2d at 354. Although the defendant had not even observed or managed construction itself, the manufacturer had "designed the entry and exit terminals of the continuous anneal line [a steel plant], assembled the components and supervised their installation to ensure that the components were properly integrated with the rest of the system." *Id.* See, *e.g.*,

*Herriott*, 998 F.2d at 490–91 (affirming summary judgment where manufacturer's "substantial role in designing and constructing the coke-processing facility and its accessory components place[d] it squarely within the class of defendants covered by the statute"). In contrast, in *Garrison*, the Seventh Circuit rejected a manufacturer's claim that it "specially custom made" a switch in an oil field and therefore refused to insulate the manufacturer under the construction statute of repose. Rejecting the defendant's argument that it had designed the switch "according to specifications provided by the builders of the switching station," the manufacturer was not in the statute's reach because:

> the switch was designed about 1955—approximately three to four years before the one in question was purchased and installed. Also about 1955, the switch in question was patented and issued a serial number, further suggesting that the switch was a standardized product. Moreover, the switch was included in a catalogue, from which customers could order it. On these facts, it seems clear that the switch in question was not designed with the [purchaser's] oil field in mind. Therefore, the switch was not custom-made.

*Garrison*, 36 F.3d at 593 (citations omitted).

Here, the Court agrees with Thermatool that its activities in 1994 qualify as "design of construction" within the scope of the statute. Metal-Matic, the purchaser, ordered design and layout drawings from Thermatool. [48-2 (Ex. 1, Flying Cutoff Sales Work Order) at T33, 34.] (sales order requiring Thermatool to provide "[i]nstallation layout drawings" and "send preliminary layout drawings"). Pursuant to that sales order, Thermatool furnished Metal-Matic with detailed design drawings spanning at least twenty-eight pages, which included proposed design and floor plan layouts. [49 (Def. SOF) at ¶ 4; 48-2.] Those drawings link up to Metal-Matic, which is identified as the drawings and the job number. [48-3 (Ex. 2, Design Drawings) at 23; 69 (Nallen Decl.) at ¶ 7.] The drawings include assembly instructions and customize various aspects of the machine, including information on the size of a "trench" for the Flying Cutoff. [48-

19

3 at 28 (the Flying Cutoff would need to be installed with a "18.0 trench").][7]  Granted, Metal-

Matic owned several flying cut-off machines, but those machines were not interchangeable—they

differed in several respects, including the diameter of the pipe that can be cut by the machine, in

addition to the direction of pipe entering the cutoff, viewing window sizes, and hinge mechanisms.

[67 (Def. Reply to Pls. SOF) at ¶ 11; 62-3 (Ex. D, Bolz Dep.) at 4, 22:2 – 10, 22:18 – 23, 23:8 –

12; at 5, 29:1 – 20.]  Neither does Plaintiffs' argument that the machine had a serial number hold

water.  Far from boxing up a standard product off the assembly line, and unlike the oil switch in

*Garrison*, the undisputed facts show that Thermatool designed, delivered, and supervised

installation of a tailored product.  Compare *Garrison*, 36 F.3d at 592–93.  In short, Thermatool

engaged in design activities warranting the application of the Construction Statute.

   Plaintiffs' additional arguments likewise fail to reveal a triable issue on the applicability of

the statute of repose.  First up is the argument that the statute is designed to protect "participants

in the construction process" and Thermatool "was not, and is not, an architect, engineer, contractor

or builder. Rather, [Thermatool] is merely an equipment manufacturer."  [60 (Pls. Br.) at 17.]  But

---

[7] Plaintiffs take issue with this evidence for several reasons, but none of their arguments create a triable
issue of fact in regard to whether Thermatool customized the Flying Cutoff.  First, Plaintiffs argue that the
design plans and floor plans are not admissible evidence because in its Rule 56.1 statement, Thermatool
relied on its lawyer to authenticate the floor drawings and the lawyer lacks personal knowledge about the
records.  [60 (Pls. Br.) at 17 n.2.]  Second, "[i]n addition to not being admissible evidence, there is no
indication that [Thermatool] had any involvement with installing the machine, as there are no details
provided as to what, if any, "assistance" was provided.  [*Id.*]  Third, some pages of the floor drawings leave
the customer order and number blank or include a note that says "Not a Floor Plan."  [*Id.*] (citing [48-3 (Ex.
2, Design Drawings) at 4; 25]).

   None of these points introduce a triable issue of fact on whether Thermatool customized the
Machine.  Thermatool has remedied the admissability, authentication, and relevance issues by
supplementing the record with the declaration of Michael Nallen, the President of Thermatool, who attested
to his personal knowledge of the relevant exhibits (including the proposal and sales order (Exhibit 1) and
the detailed drawings (Exhibit 2)).  See [69 (Nallen Decl.) at ¶¶ 1, 5–7.]  Nallen also declared that despite
the gaps on some pages of the multi-page design and floor plans, the documents relate to the specific Flying
Cutoff at issue in the case. See [*id.* at ¶¶ 3, 7.]  ("On their face, these drawings confirm that they were made
for Metal-Matic because the customer name 'Metal Matic' and job number '41700' appear on these
drawings").  Plaintiffs have not controverted any of Nallen's statements.

as the cases cited by Plaintiffs make clear, a defendant's conduct, not its label, dictates whether the statute applies. See *Herriott*, 998 F.2d at 490 ("'[m]ere labels are not dispositive' and section 13–214 'protects, on its face, anyone who engages in the enumerated activities.'").

In a twist on the same "manufacturer, not builder," argument, Plaintiff asserts that Thermatool lacks "evidence here that [Thermatool] had any involvement whatsoever in the construction of Metal-Matic's Bedford Park plant," instead it "merely provided equipment." [60 (Pls. Br.) at 17.] However, a defendant need not install equipment or even be on site to qualify for the statutory protection. See *Herriott*, 998 F.2d at 488, 490–91 (defendant had not even observed or managed construction itself). Nevertheless, even if more hands-on involvement by a manufacturer were required than under *Herriott* and *Hausman*, the record contradicts Plaintiffs' view that Thermatool was not involved in installation of the Flying Cutoff. Thermatool not only tailored the Flying Cutoff machine for this specific facility and with certain requested features, as described above, but it also visited the facility to supervise start-up. Business records indicate that Thermatool's representatives spent five-days at the facility gearing up the machine for use, including by inspecting, testing, and training employees on how to use the Flying Cutoff. See [69 (Nallen Decl.) at ¶ 8] (declaring personal knowledge that the customer service form for the Flying Cutoff indicates that a "Thermatool representative at Metal-Matic's facility assisted with the commissioning of the Flying Cutoff, including offering training on the use of the Flying Cutoff."); [48-5 (Ex. 4, Custom Acknowledgment Form) at 3.]

In sum, Thermatool has met its burden on both elements of the statute-of-repose affirmative defense, thus barring Plaintiffs' negligent design and warning claims to the extent they concern the original manufacture of the Flying Cutoff.[8]

---

[8] Later, in wrapping up its brief, Plaintiff also raises a list of questions of fact that, in its view preclude summary judgment on this negligence claim. Specifically, Plaintiff argues that Thermatool breached its

### B. Negligence for Post-Alteration Repair Visits

Shifting to the only non-time-barred theory of recovery, all that remains of the negligence claim is Plaintiffs' fallback position: even if the statute of repose bars any negligence claim arising from the original design defects, Thermatool had a separate, independent obligation that arose from the provision of maintenance and repair in 2016 and 2017 on the machine within two years of the incident. Thermatool argues that it is entitled to judgment as a matter of law on the negligence claim because Plaintiffs cannot raise a triable issue to satisfy the duty element. Plaintiffs disagree, arguing that Thermatool "had an ongoing duty as a result of it performing maintenance and repairs on the Machine." [60 (Pls. Br.) at 19.] Plaintiff insists that Thermatool "perform[ed] maintenance and repairs on the Machine on numerous occasions, that were performed *after* the 2012 modification on the Machine that [Thermatool] relies on." [*Id.* at 25.] In addition, as a manufacturer, Thermatool "was in a unique position, armed with superior knowledge, to alert Tony and Metal-Matic of the dangers associated with the Machine, including those resulting from the modification." [*Id.*] Accordingly, whether Thermatool had an "informational advantage over Metal-Matic is disputed and contrary to the evidence." [*Id.*] (citation omitted).

---

duty, including (1) "the lack of interlocks and warnings in the area where the incident occurred," (2) "a frequent problem with the sprayer blades on the Machine breaking," (3) an improper design to the Flying Cutoff, the need to repair the top rail of the Machine. [60 (Pls. Br.) at 25.] The Court will not reach these theories. As the Court has already noted, any genuine dispute of facts about the original design defect is time barred by the construction statute of repose and therefore any issue of fact on these questions do not affect the Court's determination.

Moreover, even assuming for the sake of argument that the statute of repose did not bar Plaintiffs' action, the claim also fails for the independent reason that Metal-Matic's modification was not objectively foreseeable to Thermatool in June 1995. Metal-Matic made a substantial change to the Flying Cutoff when it directed its own maintenance personnel to saw a hole in the machine. In so doing, "Metal-Matic created an entirely new way for an operator to access the Flying Cutoff while evading the interlock function as it existed on the Flying Cutoff." [50 (Def. Br.) at 26.]

Plaintiffs have not introduced a triable issue to survive summary judgment on this negligence claim either. "To prove a defendant's negligence under Illinois law, a plaintiff must establish 'the existence of a duty of care owed by the defendant to the plaintiff, a breach of that duty, and an injury proximately caused by that breach.' Whether a duty exists is a question of law." *Hutchison v. Fitzgerald Equip. Co., Inc.*, 910 F.3d 1016, 1022 (7th Cir. 2018) (citation omitted) (first quoting *Buechel v. United States*, 746 F.3d 753, 763–64 (7th Cir. 2014); then citing *Thompson v. Gordon*, 948 N.E.2d 39, 45 (2011)). To the extent any lingering claim remains, Thermatool has shouldered *its* burden to show that they did not owe Plaintiff a duty as a matter of law.

### 1.    Statute of Repose

As a preliminary matter, there is good reason to think that—to the extent Plaintiffs arguments about Thermatool's failure to warn are premised on defects in the original design (such as the sprayer blades breaking, or the lack of an interlock function)—Thermatool's maintenance on the machine might still be subject to the statute of repose. To be sure, Illinois case law suggests that a manufacturer that wears several hats might qualify for the statute's protection for some conduct but not others. Take, for example, where a manufacturer designs and maintains equipment. In that scenario, "an installer of a power system could be held liable for negligent maintenance of that system, notwithstanding the fact that the alleged defects originated during the installation of the system." *Ryan v. Commonwealth Edison Co.*, 885 N.E.2d 544, 549 (2008) (describing holding of *MBA Enters.*, 717 N.E.2d at 851).

The wrinkle in this case, however, is that there appears to be some disagreement within the Illinois state courts about whether a plaintiff can proceed on a claim that a defendant shirked its responsibility to discover and correct a design defect. Some courts have held that "an installer of

an improvement to real property arising from its activity as an inspector, rather than its activity as an installer, * * * can be held liable for breach of that duty regardless of the statute of repose." *Ryan*, 885 N.E.2d at 552–53; *Eskew v. Burlington N. & Santa Fe Ry. Co.*, 2011 IL App (1st) 093450, ¶¶ 55–57, 958 N.E.2d 426, 443. Others have diverged from that view, concluding that the statute of repose bars a claim if the installer's breach of duty consists of the failure to discover and correct a design defect, regardless of the fact that the installer has an independent duty to inspect and maintain the property at issue. See *CITGO Petroleum Corp. v. McDermott Intern.*, 858 N.E.2d 563, 569 (Ill. App. Ct. 2006) ("As the dissent in *MBA* pointed out, because the plaintiffs' claims, although couched in terms of "failure to maintain," were based on a defective product that was installed at the time of the construction of the gas piping system, they fell within the statute of repose and were thus time-barred."); *O'Brien v. City of Chicago*, 674 N.E.2d 927, 933 (Ill. App. Ct. 1996).

The Court will assume without deciding that Plaintiffs have not missed the boat and may, in fact, argue that Thermatool's maintenance responsibilities give rise to a duty to warn about the dangers of the access hole for three reasons. First, it appears possible to tease out an argument that Thermatool owed a duty to warn about the dangers of the access hole without dragging in the design issues. Thus, a jury could hypothetically consider whether Thermatool should have seen and recommended that Metal-Matic take precautions for the access hole even if Illinois law might not allow that same jury to consider a breach of a duty (if any) to warn about the danger that resulted from the interplay between the access hole and the design defects. For example, Plaintiffs could not argue that Thermatool had a duty to notice that the access hole was dangerous *because* there was no interlock to shut the machine off when he put his hand in. Second, Thermatool appears to concede that Plaintiffs may proceed on that basis. Third, and most salient, even assuming that

Plaintiffs may pursue a claim against Thermatool in its maintenance capacities, that claim fails on the merits.

### 2. Duty

Thermatool argues that Plaintiffs' negligence claim fails because Thermatool indisputably owed no duty to Plaintiff. In opposition [60], Plaintiff argues that by performing maintenance on the Flying Cutoff *after* Metal-Matic cut the access hole, Thermatool undertook a duty to both Rein and Metal-Matic. The argument goes that, as the manufacturer of the machine and with its "unique position, armed with superior knowledge," Thermatool had a duty "to alert Tony and Metal-Matic of the dangers associated with the Machine, including those resulting from the modification." [60 (Pls. Br.) at 25.] In reply, Thermatool disputes that it had a duty because (1) a duty to warn does not exist when the danger in operating equipment is obvious; (2) Thermatool did not assume an ongoing general duty of maintenance—it was simply supplementing, not supplanting Metal-Matic's own employees and a third vendor who performed maintenance and safety inspections on the machine. See [66 (Def. Reply Br.) at 20–21.] Thermatool also points out several other snags in Plaintiffs' voluntary undertaking theory: (1) Thermatool did not undertake a duty to fix the flap or provide an interlock during its 2016 and 2017 service calls, (2) there are no problems with the repairs Thermatool made during the 2016 and 2017 service visits, and at this juncture to proceed on its theory, Plaintiffs would need to identify *some* unreasonable conduct; (3) Metal-Matic did not rely on Thermatool to make safety recommendations. [*Id.* at 23.]

The Court shares Thermatool's view that the negligence claims fails because there is no triable issue of fact that Thermatool owed Plaintiffs a duty based on its Thermatool's voluntary undertaking to repair the Flying Cutoff between 2016 and 2017.

To assess whether a duty exists, the Court must ask "whether a plaintiff and a defendant stood in such a relationship to one another that the law imposed upon the defendant an obligation of reasonable conduct for the benefit of the plaintiff.'" *Hutchison*, 910 F.3d at 1025 (quoting *Vesely v. Armslist LLC*, 762 F.3d 661, 665 (7th Cir. 2014)). Under Illinois law, one possibility is the "voluntary assumption of duty theory. 'In situations in which a duty would not otherwise arise, a duty to act reasonably may be imposed when a defendant negligently performs a voluntary undertaking.'" *Thornton v. M7 Aerospace LP*, 796 F.3d 757, 768 (7th Cir. 2015) (citation omitted) (quoting *Ordman v. Dacon Mgmt. Corp.*, 633 N.E.2d 1307, 1310 (1994)). Under the RESTATEMENT (SECOND) OF TORTS § 324(A), adopted by Illinois courts, to prevail on a theory of voluntary undertaking, a plaintiff must satisfy one of the following three avenues: "(a) 'a party undertakes to do something and then fails to exercise reasonable care in a way that increases a third party's risk of harm'; (b) a party 'undertakes to perform a duty that a different party was obligated to perform and then negligently fulfills its duty'; or (c) 'a third party relies to its detriment on the fact that a duty has been voluntarily undertaken.'" See *Jakubowski v. Alden-Bennett Constr. Co.*, 763 N.E.2d 790, 799–800 (Ill. App. Ct. 2002) (adopting RESTATEMENT (SECOND) OF TORTS); *Thornton*, 796 F.3d at 768 (quoting *LM ex rel. KM v. United States*, 344 F.3d 695, 701 (7th Cir. 2003)).

The case law teaches that "[t]he extent of the duty imposed on one who voluntarily undertakes to perform an act is limited to the extent of the undertaking." *Thornton*, 796 F.3d at 768 (quoting *Ordman*, 633 N.E.2d at 1310). As a matter of public policy, "[t]he theory of voluntary assumption of a duty is narrowly construed." *Id.* at 768 (quoting *Bell v. Hutsell*, 353 Ill.Dec. 288, 955 N.E.2d 1099, 1104 (2011)). See, *e.g.*, *Rogers v. Clark Equip. Co.*, 744 N.E.2d 364, 369–70 (Ill. App. Ct. 2001) (rejecting voluntary undertaking theory premised on a duty that

"would impose upon distributors a continuous duty to inform customers of manufacturers' safety improvements for products that are not defective or unreasonably dangerous as built" and agreeing with other Illinois courts' assessment that whether to impose such a duty by statute was within the province of the legislature, not that court).

Moreover, the nature of a court's inquiry depends on whether a plaintiff's claim is premised on defendant's omission, rather than an affirmative act. If "the plaintiff seeks to hold the defendant liable for nonfeasance (omission to perform a voluntary undertaking) rather than misfeasance (negligent performance of a voluntary undertaking), Illinois law requires that the harm suffered must be a result of one's reliance upon the undertaking." *Thornton*, 796 F.3d at 768. See, *e.g.*, *Avila v. Chicago Transit Auth.*, 2021 IL App (1st) 190636, ¶ 48 (affirming judgment in defendants favor under a voluntary undertaking theory where "there [was] no indication that the CTA ever expressed an intention to install a" safety mechanism "nor did plaintiff allege that she relied on any such promise").

Again, Plaintiffs appear to argue that Thermatool abdicated its responsibility by failing to warn Rein and Metal-Matic when it voluntarily undertook certain repairs here. The Illinois Supreme Court has held that "[a] duty to warn exists where there is unequal knowledge, actual or constructive [of a dangerous condition], and the defendant[,] * * * knows or should know that harm might or could occur if no warning is given." *Happel v. Wal-Mart Stores*, 199 Ill. 2d 179, 186 (2002) (quoting *Schellenberg v. Winnetka Park Dist.*, 596 N.E.2d 93 (Ill. App. Ct. 1992).

Both parties cite *Hutchison v. Fitzgerald Equip. Co., Inc.*, 910 F.3d 1016, 1025 (7th Cir. 2018), which is exactly on point for plaintiff's duty-to-warn and voluntary undertaking theories of the case. In *Hutchinson*, the plaintiff was injured on the job when a forklift backed over his foot. 910 F.3d at 1020. His employer had contracted with a company to provide "preventative

maintenance" to the forklift involved in the accident, and the maintenance agreement solely required the company "to perform the lubrication and operational maintenance inspection" outlined by a specific form. *Id.* at 1020–21. The injured employee brought a negligence action against the maintenance company. See *id.* at 1021.

The Seventh Circuit affirmed the district court's grant of summary judgment in the company's favor, agreeing that the defendant did not owe the plaintiff a duty to warn nor was the company liable under a theory of voluntary undertaking. As to the question of duty, the court of appeals rejected the plaintiff's argument that the company-defendant "had unequal knowledge of the risks and hazards of operating a forklift without a backup alarm" and therefore a duty to warn plaintiff's employer. *Id.* at 1022. There was no "evidence in the record that [the defendant-company] knew of risks that [the employer] did not" in part because there was no evidence of a backup alarm, let alone whether it was inoperable and in need of repair. *Id.* at 1022–23. Nor did defendant's expertise in forklifts serve as "evidence of unequal knowledge," because the owner "was responsible for deciding" what to do with the forklift, and "[t]he duty to warn does not encompass a duty to recommend optional safety features to an owner who already knows about them." *Id.* at 1023.

The plaintiff's voluntary undertaking theory in *Hutchinson* fared no better. The company-defendant did not, as plaintiff argued, "voluntarily undert[ake] [the] responsibility to advise [the employer] to install a backup alarm on its [forklift] if other forklifts" had them for two reasons. *Hutchinson*, 910 F.3d at 1023. The company's undertaking was "limited to the scope of the contract" with the employer, namely "'to perform the lubrication and operational maintenance inspection[s].'" *Id.* (alteration in original). The plaintiff had "not pointed to any evidence establishing that [the company-defendant] undertook any additional duty to [the employer] outside

28

the scope of the Agreement." *Id.* at 1024. Even had the plaintiff articulated a voluntary undertaking, the company-defendant could not meet any of the three avenues available under § 324(A) of the Restatement: the company did not increase the risk of harm to the plaintiff, did not supplant the employer's duty to conduct inspection and maintenance, and also there was no evidence of reliance, which is required in the case of nonfeasance. *Id.* & 1025 n.4. See, *e.g.*, *Thornton*, 796 F.3d at 768 (affirming summary judgment that there was no voluntary undertaking premised on defendant's nonfeasance, "plaintiffs [ha[d] failed to provide any evidence that demonstrates that their injuries occurred because of [the operator's] reliance on [the manufacturer-defendant]").

Applying those principles to the instant case, there was neither a duty to warn nor liability arising from Thermatool's "voluntary undertaking." Plaintiffs have not raised a triable issue on any of the avenues available to them under the RESTATEMENT. Any danger with respect to the access hole/flap far exceeds the scope of Thermatool's 2016-2017 maintenance visits. Thermatool's duty is limited to the extent of the undertaking—the repair contracts between Metal-Matic and Thermatool. The customer service orders between Metal-Matic and Thermatool documenting the 2016-2017 visits describe problems entirely unrelated to the access hole, the flap, the sprayer blades, the interlock mechanisms, or the general safety of the machine. See above, Part IIIA.2; see, *e.g.*, [61 (Pls. SOF) at 8, ¶ 12a; 62-4 (Ex. E, Thermatool Customer Service Acknowledgment) at 5; 48-13 (Ex. 12, 2016 & 2017 Maintenance Records).] Although the details of those contracts is not crystal clear, Plaintiff cannot rely on mere speculation to proceed to trial on whether the maintenance repairs had anything to do with a duty to warn him about the dangers of the access hole. Construing Thermatool's duty narrowly,[9] as the Court must under Illinois law,

---

[9] In other words, as Thermatool put it, the extent of Thermatool's duty was not a general ongoing maintenance duty. [66 (Def. Reply Br.) at 23.] And in fact, even if Thermatool had some general duty, its

see *Thornton*, 796 F.3d at 768, the only evidence in the record shows that Metal-Matic contracted with Thermatool to perform specific repairs. Like the narrow scope of the contract duties in *Hutchinson*, Plaintiffs cannot point to any evidence to establish that Thermatool undertook any *additional* duties outside of the specified repairs, such as a duty to inspect or provide safety recommendations to Rein's employer. See *Hutchinson*, 910 F.3d at 1024.

Even if Thermatool voluntarily undertook some duty here, there is no triable issue of fact on any of the three Restatement avenues for pursuing relief. As Thermatool points out, there is no evidence in the record that there were problems with the repairs Thermatool made during the 2016 and 2017 service visits (*i.e.*, after the hole was cut) that would amount to a "fail[ure] to exercise reasonable care in a way that increases a third party's risk of harm" under § 324(a). See *Jakubowski*, 763 N.E.2d at 799 (to prevail on a theory of voluntary undertaking, a plaintiff must show: "(a) 'a party undertakes to do something and then fails to exercise reasonable care in a way that increases a third party's risk of harm'" (citing RESTATEMENT (SECOND) OF TORTS, § 324(a)). Nor is there any evidence that Metal-Matic had a general ongoing maintenance duty in part because Thermatool merely supplemented, not supplanted, Metal-Matic's own employee's and other vendors' repairs and safety inspections of the machine. See [68-5 (Ex. E, Phillips Dep.) at 4, 49:2–4.]

Nor is there a genuine dispute that "'a third party relie[d] to its detriment on the fact that a duty has been voluntarily undertaken.'" See *Jakubowski*, 763 N.E.2d at 799 (citing RESTATEMENT (SECOND) OF TORTS, § 324(a)). Plaintiffs' theory of the case is that Thermatool *failed* to act -- Thermatool should have, but did not, notice the hole that someone else cut into the Flying Cutoff, then it should have warned Metal-Matic and Rein about the dangers this alteration posed. In other

---

duties at most supplemented, not supplanted Metal-Matic's maintenance of the machine because the employer used its own employees and a third-party to inspect the machine.

words, Plaintiffs complain about Thermatool's omission, so there is no liability unless Plaintiff relied on Thermatool to make safety recommendations. Again, like the plaintiffs in *Hutchinson* and *Thornton*, there is not even a whisper to suggest that Rein, much less his employer, relied on Thermatool's recommendations about the safety of the Flying Cutoff or the access hole to the Flying Cutoff. *Hutchinson*, 910 F.3d at 1024 (absent plaintiff's reliance, defendant could not proceed on this nonfeasance theory); *Thornton*, 796 F.3d at 768 (affirming summary judgment that there was no voluntary undertaking when it was premised on defendant's omission, "plaintiffs [ha[d] failed to provide any evidence that demonstrates that their injuries occurred because of [the operator's] reliance on [the manufacturer-defendant]").[10]

In sum, because there is no triable issue on the duty element of Plaintiffs' negligence claim, the negligence claim fails as a matter of law.

---

[10] None of Plaintiffs' arguments to the contrary are availing. Plaintiffs maintain that Thermatool had a duty to warn because the company had "far superior knowledge to both Metal-Matic and Tony on the dangers presented in the Machine as it existed at the time of the incident," because (1) the 2012 modification— including the flap—was easily visible on the machine, and (2) Thermatool's representatives "who extensively worked on the Machine after [the flap] was in place should have been aware of it." [60 (Pls. Br.) at 23.] Plaintiff goes on to assert that (3) Thermatool submits no evidence that it did not have knowledge of the 2012 modification, and that Thermatool "should have known" of the defective condition. See [*id.*]

Thermatool did not wield unequal knowledge over Plaintiff's employer, Metal-Matic. There is no question that Metal-Matic, not Thermatool, decided to alter the Flying Cutoff. Only Metal-Matic's employees knew there was a way to put your hand into the machine without shutting it off. As in *Hutchinson,* there was no "evidence in the record that [the defendant-company] knew of risks that [the employer] did not." See *id.* at 1024. Nor did Thermatool's expertise as the original manufacturer raise a genuine dispute that Thermatool harbored "unequal knowledge," because Metal-Matic, "the owner[,] was responsible for deciding" what to do with the Flying Cutoff. See *id.* Plaintiffs' attempt to distinguish *Hutchinson* is unavailing. [60 (Pls. Br.) at 24.] To be sure, Thermatool was the manufacturer of the Flying Cutoff. However, its expertise about the machine is irrelevant unless it knew about the alteration—the access hole. Plaintiff has introduced zero evidence that Flying Cutoff knew about the access hole, much less its purpose or any hazards its created, so Thermatool did not have an upper-hand over Metal-Matic or Rein himself in regard to assessing any associated risk.

### C.     Loss of Consortium

Finally, Plaintiff Jacqueline Rein's derivative claim falters as well.  Her claim for a loss of consortium "depends upon the validity of the injured spouse's claims," and as such cannot survive judgment as a matter of law on the negligence claim.  See *McCreary v. Libbey-Owens-Ford Co.*, 132 F.3d 1159, 1167 (7th Cir. 1997); *Hammond v. North American Asbestos Corp.*, 105 Ill. App. 3d 1033, 1041 (4th Dist. 1982).

### IV.     Conclusion

Plaintiffs' injuries arose nearly twenty-five years after Defendant Thermatool designed and sold the machine at the heart of this case.  For the reasons stated above, having found that Thermatool is entitled to judgment as a matter of law that its construction activities fall squarely within the Illinois construction statute of repose and that any surviving claim for negligent repairs fails on the merits, the Court grants Thermatool's motion [48, 50] for summary judgment. A final judgment consistent with Federal Rule of Civil Procedure 58 will issue on these claims.  Civil case terminated.

Dated: June 13, 2022

Robert M. Dow, Jr.
United States District Judge